AO 241 (Rev. 09/17)

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Eastern Division | |
|---|---|---|
| Name (under which you were convicted):<br><br>DANIEL PRUNTY | | Docket or Case No.: |
| Place of Confinement :<br>Souza Baranowski PO Box 8000 Shirley MA 01464 | Prisoner No.:<br><br>W87138 | |
| Petitioner (include the name under which you were convicted)<br><br>Daniel Prunty | v. | Respondent (authorized person having custody of petitioner)<br>Dean Gray Superintendent of Sousa Baranowski<br>Correctional Facility, Dept. of Corrections |
| The Attorney General of the State of: Massachusetts | | |

### PETITION

1.   (a) Name and location of court that entered the judgment of conviction you are challenging:

    Barnstable Superior Court 3195 Main Street Barnstable MA 02630

    (b) Criminal docket or case number (if you know):    BACR2004-00117

2.   (a) Date of the judgment of conviction (if you know):   02/15/2006

    (b) Date of sentencing:    02/15/2006

3.   Length of sentence:    Life imprisonment without the possibility of parole

4.   In this case, were you convicted on more than one count or of more than one crime?   ☑ Yes    ☐ No

5.   Identify all crimes of which you were convicted and sentenced in this case:

    Murder in the first degree; assault & battery with a dangerous weapon; attempted extortion

6.   (a) What was your plea? (Check one)

    ☑ (1)    Not guilty      ☐ (3)    Nolo contendere (no contest)

    ☐ (2)    Guilty         ☐ (4)    Insanity plea

AO 241 (Rev. 09/17)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did
you plead guilty to and what did you plead not guilty to?    N/A

(c) If you went to trial, what kind of trial did you have? (Check one)

      ☑ Jury    ☐ Judge only

7.    Did you testify at a pretrial hearing, trial, or a post-trial hearing?

      ☑ Yes    ☐ No

8.    Did you appeal from the judgment of conviction?

      ☑ Yes    ☐ No

9.    If you did appeal, answer the following:

(a) Name of court:   Massachusetts Supreme Judicial Court

(b) Docket or case number (if you know):   SJC-09849

(c) Result:   Conviction affirmed

(d) Date of result (if you know):   05/23/2012

(e) Citation to the case (if you know):   462 Mass. 295 (2012)

(f) Grounds raised:   1. Improper peremptory challenge on the basis of race

2. Improper limiting instruction on the use of a witness's prior inconsistent statement

(g) Did you seek further review by a higher state court?   ☐ Yes  ☑ No

If yes, answer the following:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Result:

AO 241 (Rev. 09/17)

    (4) Date of result (if you know): _____

    (5) Citation to the case (if you know): _____

    (6) Grounds raised: _____

    _____

    _____

    _____

    _____

(h) Did you file a petition for certiorari in the United States Supreme Court?   ☐ Yes   ☑ No

    If yes, answer the following:

    (1) Docket or case number (if you know): _____

    (2) Result: _____

    _____

    (3) Date of result (if you know): _____

    (4) Citation to the case (if you know): _____

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?   ☑ Yes   ☐ No

11.    If your answer to Question 10 was "Yes," give the following information:

(a)    (1) Name of court:   Barnstable Superior Court

    (2) Docket or case number (if you know):   BACR2004-00117

    (3) Date of filing (if you know):   08/16/2013

    (4) Nature of the proceeding:   Motion for a new trial

    (5) Grounds raised:   See attached sheet for grounds raised and facts.

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ☑ Yes   ☐ No

    (7) Result:   New trial motion denied

AO 241 (Rev. 09/17)

(8) Date of result (if you know):   01/17/2020

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court:   Massachusetts Supreme Judicial Court

(2) Docket or case number (if you know):   SJC 2020-0069

(3) Date of filing (if you know):   02/13/2020

(4) Nature of the proceeding:   Gatekeeper Petition and Supplemental Gatekeeper petition

(5) Grounds raised:   See attached sheet

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☑ No

(7) Result:   Gatekeeper petition denied

(8) Date of result (if you know):   02/26/2021

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:   N/A

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

AO 241 (Rev. 09/17)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☐ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application,

or motion?

(1) First petition:   ☐ Yes   ☐ No

(2) Second petition:   ☐ Yes   ☐ No

(3) Third petition:   ☐ Yes   ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

GROUND ONE:   Trial and appellate councel failed to utilize a ballistic expert and blood spatter expert which

proved that the shooting was an accidental shooting and did not support a murder one conviction.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Based upon uncontroverted expert testimony of the ballistic expert at the motion hearing, the expert opined that

the shooting was an accidental shooting. The expert testified that the shooting occurred after a bullet was

inadvertently left in the rifle's chamber after the rotary magazine was removed from the rifle at some point prior to

the shooting. As such, the shooter would have no way of knowing that a bullet remained in the gun because it

appeared unloaded because the magazine was not in the rifle. The expert testified that this is a common

occurrance with accidental shootings.

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

Petitioner Prunty exhausted all of his state remedies

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(c)  **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?  ☐ Yes  ☑ No

(2) If you did not raise this issue in your direct appeal, explain why:

Appellate counsel was ineffective for not raising this issue

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes  ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:  Motion for a new trial

Name and location of the court where the motion or petition was filed:

Barnstable Superior Court 3195 Main Street Barnstable MA 02630

Docket or case number (if you know):  BACR2004-00117

Date of the court's decision:  01/17/2020

Result (attach a copy of the court's opinion or order, if available):

See attached order

(3) Did you receive a hearing on your motion or petition?  ☑ Yes  ☐ No

(4) Did you appeal from the denial of your motion or petition?  ☑ Yes  ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ☑ Yes  ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:  Massachusetts Supreme Court

1 Pemberton Square, Boston, MA 02108

Docket or case number (if you know):  SJC 2020-0069

Date of the court's decision:  02/26/2021

Result (attach a copy of the court's opinion or order, if available):

See attached order

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

N/A

AO 241 (Rev. 09/17)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: _____

_____

**GROUND TWO:**          The trial prosecutor threatened the defendant's main alibi witness with perjury and then arrested her for perjury and kept her in jail until she changed her testimony which exculpated the defendant.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The defendant's main witness told the police, the grand jury, an investigator, her boyfriend and her parents that she and the defendant were in the bathroom at the time the victim was shot in the kitchen. She told everyone that she did not see the shooting, nor did the defendant. The only one in the kitchen was the victim and the witness's ex-boyfriend. This alibi witness was then arrested for perjury until she changed her testimony and testified at the defendant's trial that she saw the defendant shoot the victim. This witness was released from prison after her testimony at the defendan't trial and most of her numerous crimes unrelated to the defendant's case were dropped.

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

All state remedies have been exhausted.

_____

(c)      **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?        ☐  Yes    ☑  No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

Appellate counsel was ineffective for not raising this issue

(d)      **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑  Yes    ☐  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:        motion for a new trial

Name and location of the court where the motion or petition was filed: _____

Barnstable Superior Court 3195 Main Street, Barnstable MA 02630

Docket or case number (if you know):    BACR2004-00117

AO 241 (Rev. 09/17)

Date of the court's decision:   01/17/2020

Result (attach a copy of the court's opinion or order, if available):

  Attached hereto

(3) Did you receive a hearing on your motion or petition?                                    ☑ Yes      ☐ No

(4) Did you appeal from the denial of your motion or petition?                           ☑ Yes      ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☑ Yes      ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

  Massachusetts Supreme Judicial Court 1 Pemberton Square, Boston, MA 02108

Docket or case number (if you know):   SJC 2020-0069

Date of the court's decision:   02/26/2021

Result (attach a copy of the court's opinion or order, if available):

  Attached hereto

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two :

  Exhausted all state remedies

**GROUND THREE:**       The trial prosecutor arrested the only witness to the shooting for perjury until he

changed his story that the victim shot himself or that he did not see the shooting to the defendant shot the victim.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

This witness, with a very, very extensive criminal history, originally told everyone and the police that the

victim shot himself. He changed his story at the grand jury hearing and testified that he did not witness the

shooting. This witness was arrested for perjury and released within days of the defendant's trial after testifying

that the defendant shot the victim.

AO 241 (Rev. 09/17)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

Exhausted all state remedies

_____

_____

(c)   **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☐ Yes    ☑ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

Appellate counsel was ineffective for not raising this issue

_____

(d)   **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:    Motion for a new trial

Name and location of the court where the motion or petition was filed: _____

Barnstable Superior Court 3195 Main Street Barnstable MA 02630

Docket or case number (if you know):    BACR2004-00117

Date of the court's decision:    01/17/2020

Result (attach a copy of the court's opinion or order, if available): _____

Attached hereto

_____

(3) Did you receive a hearing on your motion or petition?    ☑ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?    ☑ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☑ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Massachusetts Supreme Judicial Court, 1 Pemberton Square, Boston, MA 02108

Docket or case number (if you know):    SJC2020-0069

Date of the court's decision:    02/26/2021

Result (attach a copy of the court's opinion or order, if available): _____

See attached order

_____

_____

AO 241 (Rev. 09/17)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: N/A _____

_____

_____

**GROUND FOUR:**   The prosecution failed to perform GSR testing on the defendant's clothes he was wearing on the day of the shooting which would have provided evidence that the defendant did not shoot the victim.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

All of the clothes the defendant was wearing on the day of the shooting were immediately seized by the police.

A prosecutor ordered the state lab to test for GSR on these clothes. The trial prosecutor then ordered the state

lab not to perform these tests. The police performed voluminous GSR testing on other items (Mr. Rose shirt,

napkins, etc.) and the failure to test the defendant's clothes is indicative of selective testing to ensure the

obtainment of only inculpatory evidence against the defendant.

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

All state remedies exhausted.

_____

_____

(c)     **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?      ☐ Yes     ☑ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

Appellate counsel ineffective for failing to raise this issue. _____

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:     motion for a new trial. _____

AO 241 (Rev. 09/17)

Name and location of the court where the motion or petition was filed:

Barnstable Superior Court

Docket or case number (if you know):   BACR2004-00117

Date of the court's decision:   01/17/2020

Result (attach a copy of the court's opinion or order, if available):

Attached

(3) Did you receive a hearing on your motion or petition?                                    ☑ Yes      ☐ No

(4) Did you appeal from the denial of your motion or petition?                            ☑ Yes      ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☑ Yes      ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Massachusetts Supreme Judicial Court 1 Pemberton Square, Boston, MA 02108

Docket or case number (if you know):   SJC2020-0069

Date of the court's decision:   02/26/2021

Result (attach a copy of the court's opinion or order, if available):   Attached hereto

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you
have used to exhaust your state remedies on Ground Four:   N/A

AO 241 (Rev. 09/17)

13.   Please answer these additional questions about the petition you are filing:

    (a)   Have all grounds for relief that you have raised in this petition been presented to the highest state court

          having jurisdiction?   ☑ Yes   ☐ No

          If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

          presenting them:

    (b)   Is there any ground in this petition that has not been presented in some state or federal court?  If so, which

          ground or grounds have not been presented, and state your reasons for not presenting them:

          All grounds have been raised in state court

14.   Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

      that you challenge in this petition?   ☐   Yes   ☑ No

      If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues

      raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy

      of any court opinion or order, if available.

15.   Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

      the judgment you are challenging?   ☐   Yes   ☑ No

      If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

      raised.

AO 241 (Rev. 09/17)

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:

Attorney Stephen Neyman 50 Congress St. Suite 525 Boston MA 02109

(b) At arraignment and plea:

Attorney Stephen Neyman 50 Congress St. Suite 525 Boston MA 02109

(c) At trial:

Attorney Stephen Neyman 50 Congress St. Suite 525 Boston MA 02109

(d) At sentencing:

Attorney Stephen Neyman 50 Congress St. Suite 525 Boston MA 02109

(e) On appeal:

Attorney Charles Rankin 1666 Massachusetts Avenue Suite P16, Lexington, MA 02420

(f) In any post-conviction proceeding:

Attorney Patricia Quintilian P.O. Box 943, Williamsburg, MA 01096

(g) On appeal from any ruling against you in a post-conviction proceeding:

Attorney Patricia Quintilian P.O. Box 943, Williamsburg, MA 01096

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?  ☐ Yes  ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?  ☐ Yes  ☐ No

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

The conviction date is: 2/15/2006; The Massachusetts Supreme Judicial Court affirmed this conviction on 5/23/2012; On 8/16/2013, a motion for a new trial was filed. On 1/17/2020, the motion for a new trial was denied. On 2/14/2020, a gatekeeper petition was filed appealing this decision at the Massachusetts Supreme Judicial Court. It wad denied on 2/26/2021. The time for filing this petition is 3/3/2021. As such, this petition is timely.

AO 241 (Rev. 09/17)

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)   A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

   (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

   (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

   (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

   (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241 (Rev. 09/17)

(2)      The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: _____

Respondents to immediately release Petitioner from custody, or in the alternative, reduce his sentence to

involuntary manslaughter.

or any other relief to which petitioner may be entitled.

/s/ Patricia Quintilian
_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on _____ (date).

_____

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____

_____

_____

_____

Answer to Question #11(a)(5)(Grounds for new trial motion)

I.   Trial and appellate counsel provided ineffective assistance
of counsel by their failure to hire and utilize appropriate
experts during their investigation and presentation of the case
at both the trial and appellate level.

Defense counsels' failure to utilize a ballistics expert
deprived the defendant of a substantial ground of defense,
namely, that the shooting was an accident.

Expert ballistic analysis confirms that the fatal shot occurred
when a remaining bullet was inadvertently left in the rifle's
chamber after the rotary magazine was removed from the rifle at
a point in time prior to the shooting. With this rifle, the
magazine can be removed and a bullet that has already been
loaded will remain in the rifle. With a bullet in the firing
chamber and without a magazine in the rifle, the gun can be
fired. The Commonwealth's firearm expert also confirmed at trial
that the rifle could be fired without a magazine, but with a
bullet still in the chamber. Additionally, this rifle can be
fired without cocking the rifle. As such, with the rotary
magazine not in the rifle, the shooter would have no way of
knowing that a live round was left in the rifle. Based upon this
forensic evidence, the expert concluded that this shooting was
an accidental shooting.

II.   Defense counsel's failure to utilize expert testimony
prevented any meaningful impeachment of the Commonwealth's two
main witnesses. Trial counsel failed to utilize critical expert
testimony that would have forensically undermined the
credibility of these two witnesses. Simply put, the stories told
by these two witnesses at trial were physically impossible based
upon the working mechanics of the gun.

Further, the only eyewitness to the shooting testified at trial
that immediately after the shooting, he went to the victim who
was lying on the floor with blood spewing from the wound in his
head and "grabbed the victim by his face and asked him to hold
on." The expert, who is an expert in Blood Spatter Analysis and
Crime Scene and Shooting Reconstruction, opined that this
testimony that he grabbed the victim's face could not have
happened based upon the blood spatter evidence.

III.  The police failed to perform important tests which
undermined the police investigation and concomitant conclusion
that the defendant was the shooter. All the defendant's clothes

that he was wearing on the day of the shooting were seized by the police. Assistant District Attorney Thibeault requested that all the defendant's clothes be tested for gunshot residue. Within days of this request, the trial prosecutor ordered the state lab not to perform any tests for gunshot residue on the defendant's clothes. As such, the defendant's clothes were never tested for gunshot residue. The police and prosecutorial testing requests for GSR and DNA were voluminous for other witness clothing, napkins, and other items. The fact that the police performed voluminous GSR testing on other items is indicative of selective testing to ensure that the defendant was found guilty by failing to perform tests that could have produced exculpatory evidence.

IV.  The prosecutor prevented the Commonwealth's two main witnesses from giving exculpatory testimony for the defendant by arresting them for perjury until they changed their stories to implicate the defendant. After the shooting, the alibi witness for the defendant told the police, the Grand Jury, an investigator, her boyfriend, and her parents that she was in the bathroom with the defendant when the victim was shot and killed. The police repeatedly called her a liar and threatened her with incarceration. Two days before her Grand Jury testimony, at a meeting with the prosecutor and two policemen, the prosecutor called this witness a liar and accused her of trying to protect the defendant. The prosecutor also told her that she would be going to jail for perjury and that he would make sure she did "jail time." This witness felt that she was being forced to commit perjury. The prosecutor made good on his threats by incarcerating Pape for perjury. She then testified at trial that she saw the defendant shoot the victim.

The other main witness to the shooting similarly exculpated the defendant to the police and to the Grand Jury. Specifically, immediately after the shooting, the witness told the police that "he did not witness the shooting." He also testified under oath at the grand jury hearing that he was not in the room when the shooting occurred and he did not see what happened at the time of the shooting. At the hearing, this witness stated that the victim shot himself because "he's so depressed from everybody antagonizing him." Further elaborating, he testified that he never saw the gun immediately before or after the shooting. This witness was also charged with perjury. This witness then incriminated the defendant at trial while he was incarcerated for perjury pending trial on his own perjury charges for his exculpatory testimony given at the grand jury hearing.

2

V.    Every witness who allegedly witnessed this shooting and inculpated the defendant had substantial criminal records and were facing perjury charges in addition to other criminal charges. One of these witnesses was a known informant with a substantial criminal record. All of the Commonwealth witnesses entered into plea deals which resulted in nearly, or completely, time served.

The alibi witness was indicted, arrested and incarcerated for perjury immediately following her Grand Jury Testimony. She changed her testimony five months later immediately after her lawyer met with the prosecutor and the police and inculpated the defendant at trial. Soon after trial, this Court accepted her plea, with the prosecutor's agreement, and imposed an extremely lenient sentence (time served), resolving perjury charges and a significant number of additional pending charges. There was evidence from an investigator's interview, from a police officer's Grand Jury testimony, and from recorded telephone calls that she was seeking and demanding a plea agreement before she would testify against the defendant. There was also evidence in the prosecutor's file with notes concerning a plea agreement. However, the defendant's subpoena of this prosecutor was quashed and inquiry never allowed. All agreements should have been disclosed by the prosecutor. The defendant was denied an opportunity to question the prosecutor in this case regarding these deals.

Answer to Question #11(b)(5)(Grounds for Gatekeeper Petition)

I.    Trial and appellate counsel provided ineffective assistance
of counsel by their failure to hire and utilize appropriate
experts during their investigation and presentation of the case
at both the trial and appellate level.

Defense counsels' failure to utilize a ballistics expert
deprived the defendant of a substantial ground of defense,
namely, that the shooting was an accident.

Expert ballistic analysis confirms that the fatal shot occurred
when a remaining bullet was inadvertently left in the rifle's
chamber after the rotary magazine was removed from the rifle at
a point in time prior to the shooting. With this rifle, the
magazine can be removed and a bullet that has already been
loaded will remain in the rifle. With a bullet in the firing
chamber and without a magazine in the rifle, the gun can be
fired. The Commonwealth's firearm expert also confirmed at trial
that the rifle could be fired without a magazine, but with a
bullet still in the chamber. Additionally, this rifle can be
fired without cocking the rifle. As such, with the rotary
magazine not in the rifle, the shooter would have no way of
knowing that a live round was left in the rifle. Based upon this
forensic evidence, the expert concluded that this shooting was
an accidental shooting.

II.   The motion judge failed to determine whether defense
counsels' failure to present an "accidental firearm discharge
defense" was manifestly unreasonable and therefore constitutes
ineffective assistance of counsel. The motion judge erred when
it ruled that both trial and appellate counsel were not
ineffective in their representation because the defendant asked
his attorneys not to present the defense that the gun
"accidentally discharged." There are four decisions that relate
to the "fundamental" rights of the criminal defendant and are
therefore exclusively the defendant's to make. These decisions
are whether to plead guilty, whether to waive a jury trial,
whether to testify, and whether to appeal. Beyond these
decisions, which are deemed fundamental and personal to the
defendant, almost all other decisions are considered "strategic"
or "tactical" decisions and fall within the lawyer's control.
Strategic or tactical matters rest ultimately in counsel and the
motion judge never ruled on whether the defense lawyers were
ineffective. This failure of judicial review left the question
of whether the defendant was deprived his constitutional right
to effective assistance of counsel unanswered.

III. Defense counsel's failure to utilize expert testimony
prevented any meaningful impeachment of the Commonwealth's two
main witnesses. Trial counsel failed to utilize critical expert
testimony that would have forensically undermined the
credibility of these two witnesses. Simply put, the stories told
by these two witnesses at trial were physically impossible based
upon the working mechanics of the gun.

Further, the only eyewitness to the shooting testified at trial
that immediately after the shooting, he went to the victim who
was lying on the floor with blood spewing from the wound in his
head and "grabbed the victim by his face and asked him to hold
on." The expert, who is an expert in Blood Spatter Analysis and
Crime Scene and Shooting Reconstruction, opined that this
testimony that he grabbed the victim's face could not have
happened based upon the blood spatter evidence.

IV.   The police failed to perform important tests which
undermined the police investigation and concomitant conclusion
that the defendant was the shooter. All the defendant's clothes
that he was wearing on the day of the shooting were seized by
the police. Assistant District Attorney Thibeault requested that
all the defendant's clothes be tested for gunshot residue.
Within days of this request, the trial prosecutor ordered the
state lab not to perform any tests for gunshot residue on the
defendant's clothes. As such, the defendant's clothes were never
tested for gunshot residue. The police and prosecutorial testing
requests for GSR and DNA were voluminous for other witness
clothing, napkins, and other items. The fact that the police
performed voluminous GSR testing on other items is indicative of
selective testing to ensure that the defendant was found guilty
by failing to perform tests that could have produced exculpatory
evidence.

V.   The prosecutor prevented the Commonwealth's two main
witnesses from giving exculpatory testimony for the defendant by
arresting them for perjury until they changed their stories to
implicate the defendant. After the shooting, the alibi witness
for the defendant told the police, the Grand Jury, an
investigator, her boyfriend, and her parents that she was in the
bathroom with the defendant when the victim was shot and killed.
The police repeatedly called her a liar and threatened her with
incarceration. Two days before her Grand Jury testimony, at a
meeting with the prosecutor and two policemen, the prosecutor
called this witness a liar and accused her of trying to protect
the defendant. The prosecutor also told her that she would be
going to jail for perjury and that he would make sure she did

"jail time." This witness felt that she was being forced to commit perjury. The prosecutor made good on his threats by incarcerating the witness for perjury. She then testified at trial that she saw the defendant shoot the victim.

The other main witness to the shooting similarly exculpated the defendant to the police and to the Grand Jury. Specifically, immediately after the shooting, the witness told the police that "he did not witness the shooting." He also testified under oath at the grand jury hearing that he was not in the room when the shooting occurred and he did not see what happened at the time of the shooting. At the hearing, this witness stated that the victim shot himself because "he's so depressed from everybody antagonizing him." Further elaborating, he testified that he never saw the gun immediately before or after the shooting. This witness was also charged with perjury. This witness then incriminated the defendant at trial while he was incarcerated for perjury pending trial on his own perjury charges for his exculpatory testimony given at the grand jury hearing.

VI.  Every witness who allegedly witnessed this shooting and inculpated the defendant had substantial criminal records and were facing perjury charges in addition to other criminal charges. One of these witnesses was a known informant with a substantial criminal record. All the Commonwealth witnesses entered into plea deals which resulted in nearly, or completely, time served.

The alibi witness was indicted, arrested and incarcerated for perjury immediately following her Grand Jury Testimony. She changed her testimony five months later immediately after her lawyer met with the prosecutor and the police and she then inculpated the defendant at trial. Soon after trial, the Court accepted her plea, with the prosecutor's agreement, and imposed an extremely lenient sentence (time served), resolving perjury charges and a significant number of additional pending charges. There was evidence from an investigator's interview, from a police officer's Grand Jury testimony, and from recorded telephone calls that she was seeking and demanding a plea agreement before she would testify against the defendant. There was also evidence in the prosecutor's file with notes concerning a plea agreement. However, the defendant's subpoena of this prosecutor was quashed and inquiry never allowed. All agreements should have been disclosed by the prosecutor. The defendant was denied an opportunity to question the prosecutor in this case regarding these deals.

3

### Additional Grounds for this Habeas corpus petition.

5.   Defense counsel's failure to utilize expert testimony prevented any meaningful impeachment of the Commonwealth's two main witnesses. Trial counsel failed to utilize critical expert testimony that would have forensically undermined the credibility of these two witnesses. Simply put, the stories told by these two witnesses at trial were physically impossible based upon the working mechanics of the gun.

Further, the only eyewitness to the shooting testified at trial that immediately after the shooting, he went to the victim who was lying on the floor with blood spewing from the wound in his head and "grabbed the victim by his face and asked him to hold on." The expert, who is an expert in Blood Spatter Analysis and Crime Scene and Shooting Reconstruction, opined that this testimony that he grabbed the victim's face could not have happened based upon the blood spatter evidence.

6.   Every witness who allegedly witnessed this shooting and inculpated the defendant had substantial criminal records and were facing perjury charges in addition to other criminal charges. One of these witnesses was a known informant with a substantial criminal record. All the Commonwealth witnesses entered into plea deals which resulted in nearly, or completely, time served.

The alibi witness was indicted, arrested, and incarcerated for perjury immediately following her Grand Jury Testimony. She changed her testimony five months later immediately after her lawyer met with the prosecutor and the police and inculpated the defendant at trial. Soon after trial, this Court accepted her plea, with the prosecutor's agreement, and imposed an extremely lenient sentence (time served), resolving perjury charges and a significant number of additional pending charges. There was evidence from an investigator's interview, from a police officer's Grand Jury testimony, and from recorded telephone calls that she was seeking and demanding a plea agreement before she would testify against the defendant. There was also evidence in the prosecutor's file with notes concerning a plea agreement. However, the defendant's subpoena of this prosecutor was quashed and inquiry never allowed. All agreements should have been disclosed by the prosecutor. The defendant was denied an opportunity to question the prosecutor in this case regarding these deals.

7.    The motion judge failed to determine whether defense counsels' failure to present an "accidental firearm discharge defense" was manifestly unreasonable and therefore constitutes ineffective assistance of counsel. The motion judge erred when it ruled that both trial and appellate counsel were not ineffective in their representation because the defendant asked his attorneys not to present the defense that the gun "accidentally discharged." There are four decisions that relate to the "fundamental" rights of the criminal defendant and are therefore exclusively the defendant's to make. These decisions are whether to plead guilty, whether to waive a jury trial, whether to testify, and whether to appeal. Beyond these decisions, which are deemed fundamental and personal to the defendant, almost all other decisions are considered "strategic" or "tactical" decisions and fall within the lawyer's control. Strategic or tactical matters rest ultimately in counsel and the motion judge never ruled on whether the defense lawyers were ineffective. This failure of judicial review left the question of whether the defendant was deprived his constitutional right to effective assistance of counsel unanswered.

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPERIOR COURT
CRIMINAL ACTION
NO. BACR2004-00117

COMMONWEALTH

vs.

DANIEL PRUNTY

<u>MEMORANDUM OF DECISION AND ORDER ON
DEFENDANT'S MOTION FOR NEW TRIAL</u>

<u>INTRODUCTION</u>

On February 15, 2006, following a five-day jury trial, the defendant, Daniel Prunty
("Prunty" or the "defendant"), was convicted of one count of First Degree Murder by Deliberate
Premeditation, one count of Assault and Battery by Means of a Dangerous Weapon, and one
count of Extortion by Threat of Injury.[1] This matter is now before the Court on the defendant's
motion for new trial pursuant to Mass. R. Crim. P. 30(b).

The defendant argues that (1) he was denied effective assistance of counsel where: (a)
trial and appellate counsel failed to investigate, develop, or prepare a viable defense; (b) trial
counsel failed to obtain and utilize an expert at trial; and (c) trial counsel failed to utilize all
available scientific evidence to support a *Bowden* defense; and (2) the prosecutor and police
violated the defendant's federal and state due process rights when (a) they threatened and
subsequently incarcerated the only two witnesses to the shooting until they changed their version
of events to inculpate the defendant; and (b) the Commonwealth failed to disclose implicit and

---

[1] The trial judge was the Honorable Gary Nickerson, who has since retired.

1

undisclosed deals to witnesses who were ultimately rewarded for their trial testimony with lenient sentencing deals.[2]  The defendant also argues that the Court erred during the evidentiary hearing on his motion for new trial by admitting "other bad act" evidence.

Based upon an evidentiary hearing held on April 10-11, 2019, a review of the trial transcript, consideration of the memoranda and exhibits submitted by counsel, and for the reasons discussed below, the defendant's motion for a new trial is **DENIED**.

## BACKGROUND

On August 7, 2004, Jason Wells ("Wells") was killed by a single gunshot wound to his head.  On August 31, 2004, the grand jury returned three indictments against the defendant, charging him with First Degree Murder, Assault and Battery by Means of a Dangerous Weapon, and Extortion by Threat of Injury.  The defendant was tried in February 2006, and found guilty on all charges.[3]  On May 23, 2012, the Supreme Judicial Court ("SJC") denied the defendant's appeal, concluding that the trial judge did not err in rejecting trial counsel's peremptory challenge, and any error to the limiting instruction did not cause a substantial risk of a miscarriage of justice.  See *Prunty*, 462 Mass. at 296.[4]  The Court reserves its factual findings relevant to the defendant's motion for further discussion.

## DISCUSSION

Under Mass. R. Crim. P. 30(b), a judge may grant a new trial "only if it appears that

---

[2] In its motion, the Commonwealth argues that the defendant has waived all of these arguments because he failed to raise them "at the earliest possible time." *Commonwealth v. Pisa*, 384 Mass. 362, 365 (1981).  The defendant makes no counterargument to the contrary in his memoranda.  However, as the Court conducted a two-day evidentiary hearing on the motion, the Court will address the arguments made in the defendant's motion for new trial.  See *Commonwealth v. Moore*, 408 Mass. 117, 125 (1990) (motion for new trial left to judge's "sound discretion").
[3] For a complete recitation of the facts underlying the defendant's conviction, see *Commonwealth v. Prunty*, 462 Mass. 295, 296-297 (2012).
[4] The SJC also declined to exercise its power under G. L. c. 278, § 33E to order a new trial or reduce the verdict.

2.

justice may not have been done." *Commonwealth* v. *DiCicco*, 470 Mass. 720, 728 (2015) (quotations and citations omitted). "Judges are to apply the standard set forth in [R]ule 30(b) rigorously and should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth." *Commonwealth* v. *Wheeler*, 52 Mass. App. Ct. 631, 635-636 (2001), citing *Commonwealth* v. *Fanelli*, 412 Mass. 497, 504 (1992), and cases cited therein.

## I.     Ineffective Assistance of Counsel

The Court analyzes ineffective assistance of counsel under art. 12 of the Massachusetts Declaration of Rights by examining whether there has been serious incompetence, inefficiency, or inattention of counsel constituting conduct falling measurably below that expected from an ordinary fallible lawyer. See *Commonwealth* v. *Epps*, 474 Mass. 743, 756-757 (2016). The defendant is entitled to a new trial only if he demonstrates that counsel's incompetence deprived him of an otherwise available, substantial ground of defense, or that better work would have accomplished something material for the defense. *Commonwealth* v. *Hudson*, 446 Mass. 709, 725 (2006); *Commonwealth* v. *Acevedo*, 446 Mass. 435, 442 (2006). The burden of establishing ineffective assistance of counsel rests upon the defendant. See *Commonwealth* v. *Filippidakis*, 29 Mass. App. Ct. 679, 688, review denied, 409 Mass. 1102 (1991). "Judicial scrutiny of counsel's performance must be highly deferential." *Commonwealth* v. *Florentino*, 396 Mass. 689, 690 (1986).

Characterizing the conduct of counsel as strategic or tactical, however, does not immunize such conduct from judicial scrutiny. See *Commonwealth* v. *Licciardi*, 387 Mass. 670, 672 (1982); *Commonwealth* v. *Segovia*, 53 Mass. App. Ct. 184, 190 (2001). "Where the claim of

ineffectiveness involves a tactical decision of defense counsel, [a court] inquire[s] whether the decision was 'manifestly unreasonable' when made." *Commonwealth v. Lucien*, 440 Mass. 658, 670 (2004). The Court reviews tactical or strategic decisions with some deference to avoid characterizing as unreasonable a defense that was merely unsuccessful. *Commonwealth v. Shanley*, 455 Mass. 752, 768 (2010); *Commonwealth v. White*, 409 Mass. 266, 272 (1991). Trial tactics which appear questionable in hindsight will not constitute ineffective assistance of counsel unless they were manifestly unreasonable when undertaken. *Commonwealth v. Roberts*, 423 Mass. 17, 20 (1996). Mere speculation, without more, is insufficient to establish ineffective representation. *Commonwealth v. Duran*, 435 Mass. 97, 103 (2001). The defendant must also show that the alleged error resulted in "actual prejudice." *Commonwealth v. Urena*, 417 Mass. 692, 699 (1994).

The defendant alleges that both trial and appellate counsel failed to investigate, develop, or prepare a viable defense; trial counsel failed to obtain and utilize expert witnesses; and trial counsel failed to utilize evidence to support a *Bowden* defense. The Court addresses each of these arguments in turn.

### a.    Failure to investigate, develop, or prepare a viable defense

The defendant argues that counsel failed to utilize a ballistics expert, or otherwise proceed on an accidental discharge defense. The defendant further argues that this failure deprived him of a substantial ground of defense. The Court disagrees.[5]

---

[5] The defendant's reliance on *Commonwealth v. Pichardo*, 45 Mass. App. Ct. 296, review denied, 428 Mass. 1107 (1998) and *Commonwealth v. Conley*, 43 Mass. App. Ct. 385 (1997) is misplaced. In *Pichardo*, the defendant received a new trial because the trial judge incorrectly recited the third prong of malice in its jury instructions, obscuring the distinction between second-degree murder and involuntary manslaughter. See 45 Mass. App. Ct. at 297, 299-301. The defendant here has made no claim of error to the jury instructions. In *Conley*, the defendant

4

At the hearing on the motion for new trial, the defendant presented the testimony of Christopher Robinson ("Robinson"), a firearms expert. He testified that he was familiar with the Ruger Model 10 / 22 rifle, the gun used to kill Wells. He explained the mechanics of how the Ruger Model 10 / 22, like any semiautomatic firearm, works. The rifle uses a magazine that holds ten rounds. After inserting the magazine into the rifle's magazine well, a live round can be loaded into the rifle's chamber by drawing the bolt to the rear of the rifle and then releasing it. Once a live round has been loaded into the chamber, the rifle is now ready for firing, regardless of whether the magazine is subsequently removed from the well.

Based upon these mechanics, Robinson testified that, had the magazine been in the well when the rifle was fired, there would have been a live round in the chamber and only eight live rounds in the magazine. Instead, there was no live round in the chamber and nine rounds remained in the magazine.[6] Robinson opined that this was all consistent with an accidental discharge of the firearm by an individual unaware that the gun was loaded despite the absence of a magazine in the well.

Unfortunately, for the defendant, the evidence at trial showed that the defendant was the one person who could have accidentally discharged the firearm into Wells' head, the precise location the defendant had been pointing the firearm moments earlier. There was no evidence that Wells would have or could have pointed the gun at his own head in the manner that led to his death. In fact, Larry McCann, the defendant's own crime scene reconstruction expert who had been retained in preparation for trial, opined that it was impossible for Wells to have

---

received a new trial because it was "manifestly unreasonable" for defense counsel to ignore the defendant's requests to inspect the alleged victim's knife for blood. 43 Mass. App. Ct. at 385-386, 395. As provided in further detail *infra*, trial counsel wanted to proceed with an accidental discharge defense, but the defendant insisted otherwise.

accidentally shot himself.

Furthermore, there was no evidence at the trial that Christopher Rose ("Rose") pointed the gun at Wells. The only evidence that Rose pointed the gun at Wells came from the defendant during the hearing on the instant motion, not at the trial. The defendant chose not to testify at the trial, as was his right. Regardless, the Court did not find the defendant's testimony credible, especially in light of the evidence that Rose was the person who initially pushed the gun away from Wells' head when the defendant first pointed it at him in the dining room. It makes no sense that Rose would point the gun at Wells' head moments later and pull the trigger, and there was no evidence that he did.

After consulting with his own firearms expert, trial counsel reached the same conclusion as Robinson that the firearm could have accidentally discharged. Based upon his discussions with the experts he retained, trial counsel wanted to present an accidental discharge defense. The defendant, however, refused to consider such a defense and remained steadfast in his story that he had been in the bathroom with Rebecca Pape ("Pape") at the time of the shooting. See *Strickland* v. *Washington*, 466 U.S. 668, 691 (1984) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.").

As trial counsel pointed out during his testimony at the hearing, because the defendant insisted he was in the bathroom at the time of the shooting, it did not matter whether Rose shot Wells intentionally or accidentally. All that mattered to the defense was that the defendant could

---

[6] Police recovered the magazine in the kitchen on a chopping block, separate from the rifle on the kitchen counter.

not have pulled the trigger because he was in the bathroom. Everything Robinson testified to at the hearing would have been very helpful to Rose's defense had he been the one charged with murder. However, it adds nothing to the defendant's case since he claims to have been in the bathroom, unable to discharge the firearm, accidentally or otherwise.

The defendant's testimony at the hearing did not add anything to the strength of his motion. The defendant testified that had used cocaine earlier in the day with Wells and another male. He then became involved in a heated argument with Wells due to the theft of some items including cash and jewelry, some of which had significant sentimental value. He believed Wells had stolen those items the previous evening. Wells in turn tried to blame Pape for the theft. The defendant then called Pape and accused her of the theft. She arrived several hours later with several other individuals including Rose, a person the defendant testified he had never met before that day. After their arrival at the defendant's home, the argument continued with all of the individuals involved.

As the defendant's argument with Wells and Pape got more heated, Rose threatened the defendant by telling him to, "Shut the fuck up, or he was going to put a cap in his ass." Because the defendant had never met Rose before, he did not know how serious he was, nor did he know if Rose was actually armed with a gun. The defendant further testified that the purpose of retrieving the gun was to scare whoever stole his stuff into telling the truth. Regardless of the actual reason for this decision, the defendant then went upstairs to retrieve the rifle. He testified that he kept the loaded magazine on a separate shelf for safety reasons and that he never inserted the magazine into the well, but simply placed it into the pocket of his cargo shorts.[7] The Court

---

[7] It is worth noting that this testimony is inconsistent with what the defendant told his own expert, Robinson, who

does not find this testimony credible. The defendant also claimed that he never slid the bolt back to chamber a round. The Court does not find this testimony credible either.

The defendant was trying to get the culprit to admit to having stolen his property, and nothing could be more convincing to the actual thief to tell the truth than to have a loaded gun pointed at them and then to hear the sound of a live round being racked into the chamber. This would be consistent with the testimony at trial that the defendant had pointed the gun at Wells' head and cocked it, telling him, "If you don't get my stuff by sunrise, you'll never see another sunrise again."

The testimony at trial was that Wells then began to cry and admitted to taking the property. He also agreed to make some calls to get the property back. He then went into the kitchen, followed by the defendant still holding the gun, to make some phone calls. Wells' admission to the theft and his agreement to try to get the property back is consistent with his fear of being shot by the defendant after the defendant pointed the gun at him and chambered a round. When Wells was unable to reach anyone on the phone, the defendant again pointed the gun at his head and pulled the trigger and shot Wells.[8]

Trial counsel recognized that, based upon this evidence, the best defense would have been to argue that the shooting was a result of an accidental discharge. But, again, the defendant

---

testified that the defendant told him he retrieved the rifle, removed the magazine, and placed it in his pocket. It is also inconsistent with what the defendant told his trial counsel, Mr. Neyman, who testified that the defendant never told him that he did not put the magazine in the rifle. The Court finds Attorney Neyman's testimony credible in all respects.

[8] The defendant argues that there was no evidence of premeditation at trial. However, all of this evidence offered at trial, including the defendant's retrieval of the rifle from his bedroom, supported the jury's verdict as to premeditation. See *Commonwealth* v. *Rivera*, 482 Mass. 259, 272 (2019) (premeditation supported by facts that after fight with boyfriend, defendant left bedroom, walked into kitchen, picked up knife, and then returned to bedroom to commit stabbing); *Commonwealth* v. *Salazar*, 481 Mass. 105, 111 (2018) ("There is no particular length of time of reflection required to find deliberate premeditation, and the decision may be in only a few seconds.")

8

insisted that he was in the bathroom at the time of the shooting.

The defendant's testimony at the hearing, that he left the rifle on the kitchen counter, loaded or unloaded, is simply not believable.[9]  He had just had this heated argument with several people who he believed had stolen his valued personal items.  During the argument, in his own home, he was threatened by Rose, a person he had just met, and he was not sure if Rose was actually armed.  The defendant immediately went upstairs to retrieve the rifle to protect himself and to convince the thief to come clean.  Under those circumstances, it makes no sense that, moments later, he would have put the gun, loaded or unloaded, down on a counter and left the room.  That gun was his only protection from a possibly armed Rose who had just threatened to shoot him.  According to his testimony, the threat from Rose is one of the two reasons that led him to get the rifle in the first place.

Additionally, the Court finds the defendant's testimony lacks credibility in that he would not have left the kitchen just as Wells was making the calls to retrieve his stolen items.  Again, the defendant had just been in a heated argument that led to him getting his rifle and pointing it at Wells' head.  Wells, who had been denying responsibility for the theft all day long, finally confessed and promised to get the items back.  It is not believable that the defendant would have left the room just as Wells was making those calls.

Therefore, in these circumstances, the defendant failed to carry his burden that counsel was ineffective for failing to pursue an accidental discharge defense.  The accidental discharge defense would not have benefited the defendant because he insisted he was not in the room

---

(modifiers and internal quotation marks omitted).
[9] Significantly, the defendant initially failed to provide this very important detail in his direct testimony.  He only offered it after his attorney added the fact that he placed the gun on the counter, as she led him through that part of

during the shooting.

**b.**  **Failure to obtain and utilize expert witness at trial**

The defendant further argues that his trial counsel was ineffective for failing to retain an expert to meaningfully impeach the Commonwealth's only two witnesses to the shooting. He also argues that trial counsel's failure to hire a ballistics expert permitted the Commonwealth to incorrectly opine on the gunshot residue evidence. The Court disagrees.[10]

At the motion hearing, Robinson testified that the testimony of Pape and Rose was inconsistent with the firearm as recovered by the police at the crime scene. Because they both testified that the magazine was in the rifle when it was fired, there would have been a round chambered and only eight rounds left in the magazine. Robinson further testified, and the Court observed, that the magazine for this rifle is very small and could fit in the palm of someone's hand. The dimensions are approximately an inch wide, by an inch and a half tall, and an inch and a half long. On cross-examination, however, Robinson testified that the rifle could have been found with an empty chamber and nine rounds in the magazine if someone had simply removed the small magazine from the well of the rifle, drawn the bolt back slowly to remove the remaining live round from the chamber and then reinserted the live round into the magazine. Accordingly, Robinson's expert testimony would have added nothing to the impeachment of Pape and Rose because the magazine could have been in the rifle and fired and later removed along with the remaining live round.

Robinson also testified that he test fired a similar rifle. Immediately after the test fire,

---

his testimony.

[10] The Court notes that the defendant did hire a firearm expert, Ed Jachimowicz. However, he did not testify at trial because trial counsel, after consulting with the defendant, decided not to call him as a witness.

10

without a three to four hour delay, he performed a gunshot residue test and found only three to four particles of gunshot residue on his hands. He did not wash his hands, or rub them on clothing, fabric, or grass before testing. He testified that each of those things would have deteriorated any possible sample on the hands. He performed another gunshot residue test after washing his hands and found no gunshot residue. He also testified that touching anything would cause deterioration and you would not be likely to find gunshot residue on the hands after three hours. John Drugan, who had been with the state police crime lab for over thirty years, testified that the state police did not test for gunshot residue on clothing back in 2004. They only tested for samples on the hands.

The defendant has failed to demonstrate how expert testimony failed to materially add something to his defense or the decision not to have expert testimony was unreasonable. See *Acevedo*, 446 Mass. at 442 (to demonstrate ineffective assistance, defendant must show "better work might have accomplished something material for the defense"). As discussed *supra*, the defendant insisted to his trial counsel that counsel not proceed on a theory of accidental discharge by the defendant. His defense at trial was that he was not in the room when Wells' shooting occurred. Whether the shooting occurred accidentally did not materially contribute to his defense because, as the defendant alleged, he was not in the room during the shooting.

Further, trial counsel elicited the issues raised by Robinson in his cross-examination of the Commonwealth's expert witness Michael Arnold ("Arnold"). Specifically, Arnold testified, on cross-examination, that (1) he did not test for gunshot residue after test-firing the rifle; (2) the object used to wipe down the rifle would leave gunshot residue on the object; (3) the rifle could fire without the magazine; and (4) washing one's hands or clothes after firing the rifle would

11

defeat a gunshot residue test. Robinson's expert opinion would not have offered anything of substance beyond what Arnold testified to on cross-examination. See *Commonwealth v. Sena*, 441 Mass. 822, 827-830 (2004) (counsel not ineffective for failing to call expert where trial counsel effectively cross-examined Commonwealth's expert, and defendant's expert offered nothing of substance beyond testimony of Commonwealth's expert on cross).

Therefore, the Court finds that the defendant failed to carry his burden that counsel was ineffective for failing to call an expert as a witness at trial.

**c.    Failure to utilize all scientific evidence to seek *Bowden* defense**

The defendant argues that trial counsel deprived him of a substantial ground of defense when trial counsel failed to utilize all available scientific evidence to support a *Bowden* defense. The Court disagrees.

As discussed *supra*, trial counsel was not ineffective for failing to call an expert, because trial counsel effectively cross-examined the Commonwealth's expert, and nothing of substance would have been offered beyond what was testified to on cross-examination. In his closing argument, trial counsel raised several instances where investigators failed to perform a complete investigation into Wells' murder. See *Commonwealth v. Bowden*, 379 Mass. 472, 485-486 (1980) ("The failure of the authorities to conduct certain tests or produce certain evidence [is] a permissible ground to build a defense . . . ."). During his closing, trial counsel argued that investigators failed to test Rose's or the defendant's clothes for gunshot residue, Arnold never tested for gunshot residue after firing the rifle, and investigators did not perform certain DNA tests. Therefore, the Court finds that the defendant has not carried his burden that counsel was ineffective for failing to pursue a *Bowden* defense.

II.    **Police and Prosecutorial Misconduct**

    a.    **Threatening and incarcerating witnesses until they inculpate the defendant**

The Court finds no evidence that any of the witnesses were incarcerated to inculpate the

defendant. Although Pape and Rose may have been charged with perjury for lying to the grand

jury investigating the murder, and they may have been held on a bail they could not post, this

does not amount to threatening and incarcerating witnesses in order to make them inculpate the

defendant in the murder. See G. L. c. 268, § 1 ("Whoever, being lawfully required to depose the

truth in a judicial proceeding or in a proceeding in a course of justice, wilfully swears or affirms

falsely in a matter material to the issue or point in question, . . . shall be guilty of perjury."). The

two witnesses ultimately pled guilty to the perjury charges and admitted to having lied to the

grand jury.

    b.    **Rewarding witnesses with lenient sentences and deals**

Although the witnesses may have received consideration from their respective plea judges

for their trial testimony, there is no credible evidence that there were any promises, rewards or

inducements made to those witnesses prior to their testimony. Despite the defendant's

insinuations to the contrary, all of the actual evidence on this topic indicates that the

Commonwealth did not make promises to the witnesses. See *Commonwealth* v. *Jackson*, 428

Mass. 455, 458 (1998) ("The defendant's implied contention that some undisclosed

inducement[s] existed which, if exposed to the jury, would render [the witnesses'] testimony less

credible, is nothing but surmise.").

Tpr. White testified that when he first met with Pape on August 16, 2004, she told him

that she had met with Attorney Terrance O'Connell ("Attorney O'Connell") and that he told her

13

to get a deal with the police and prosecutors. Tpr. White informed her at that time that there were no deals. He also testified that it was against State Police policy for troopers to offer any promises, rewards or inducements to anyone.

Attorney O'Connell also testified at the hearing on the motion for new trial. The Court credits his testimony. After Pape's initial interview with Tpr. White, she retained O'Connell to represent her on several larceny type offenses and one perjury charge that was pending at the time of the defendant's trial. The perjury charges stemmed from the testimony she gave to the grand jury investigating Wells' death. Assistant District Attorney Robert Welsh ("ADA Welsh"), the same prosecutor who prosecuted the defendant in the murder trial, prosecuted Pape on her charges.

Attorney O'Connell testified that the government made no promises, rewards or inducements to Pape in exchange for her testimony. He never heard ADA Welsh or any of the state troopers investigating the murder offer any promises, rewards or inducements to Pape. He never told Pape to "get a deal" before speaking with the police. He also was of the opinion, as an individual with years of experience as a police officer and then as a criminal defense attorney, that Pape did not have a viable defense to the perjury charge. She never asked him to make a deal for her and he never approached ADA Welsh about that on her behalf.

O'Connell's representation of Pape simply relied on the fact that he was not going to let her lie in a murder trial. She had a significant amount of time in custody at the time of her testimony and prior to her guilty plea. She also had plans for drug treatment lined up for the court's consideration at the time of her change of plea, and to live with her father in North

14

Carolina.[11]  The Court heard no testimony that Rose, or any other witness, was offered any

promises, rewards or inducements for their testimony.

Therefore, the Court finds no evidence that these witnesses were rewarded with lenient

sentences and deals to testify against the defendant.

## III.  Motion Judge's Error in Admitting Impeachment Evidence Against Defendant

At the motion hearing, the Court heard testimony, without objection, from Det. Lt.

Michael Grassia ("Grassia"), an undercover state trooper, regarding the defendant's attempt to

hire him to kill Rose and make it look like a suicide in an effort to blame Wells' murder on Rose.

The Court also admitted, without objection, handwritten letters exchanged between Grassia and

the defendant on this topic.  Prior to the motion hearing, the defendant filed a motion in limine

(essentially argued as a Motion to Suppress), to preclude any evidence seized by the

Commonwealth pursuant to two 2009 so-called "wiretap warrants" that allowed the recording of

the conversations between the defendant and Grassia.  The motion to suppress was denied after

hearing.

The defendant now argues, for the first time, in a document entitled "Memorandum of

Law in Support of his Motion for a New Trial or a Finding of Guilt of a Lesser Included

Offense," that the Court committed error when it admitted this evidence of "other bad acts."  For

the reasons provided in the Court's December 11, 2018 Endorsement regarding Defendant's

Motion in Limine, recorded conversations were properly admitted in the circumstances of this

---

[11] Moreover, Pape's sentence was consistent with the sentencing guidelines.  As to Pape's larceny charges, for an individual with "No/Minor Record," the presumptive sentence range is zero to twenty-four months.  Here, after Pape pled guilty to the perjury charge, she received sixteen months in the house of correction, with time deemed served.  There was no evidence presented to the Court that would indicate that Salamone, Ford or Rose received sentences that were in any way inconsistent with the sentencing guidelines.

15

case. In addition, the testimony of Grassia and the letters exchanged between the defendant and Grassia were also properly admitted in the circumstances of this case. All of this information was relevant to the issue of the defendant's credibility as a witness. Regardless of the admission of this evidence, the Court based its credibility determination regarding the defendant's testimony on his demeanor and the improbability of his testimony, not on the fact that he may have discussed hiring a hitman to kill Rose and frame him for Wells' murder.

### ORDER

It is hereby **ORDERED** that the Defendant's Motion for New Trial be **DENIED**.

By the Court,

Raffi Yessayan
Justice of the Superior Court

DATED: January 17, 2020

A true copy, Attest: Clerk

16

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
No. SJ-2020-69

Barnstable Superior Court
No. BACR2004-00117

**COMMONWEALTH**

v.

**DANIEL PRUNTY**

**ORDER DENYING LEAVE TO APPEAL**

The defendant, Daniel Prunty, filed an application pursuant to G. L. c. 278, § 33E, for leave to appeal from the denial of a motion for a new trial docketed on January 17, 2020 in Barnstable Superior Court docket number BACR2004-00117.

A defendant is not entitled to appeal a denial of a post-appeal motion for a new trial following plenary review on direct appeal under G. L. c. 278, § 33E, unless a single justice of this court allows it "on the grounds that it presents a new and substantial question which ought to be determined by the full court." See Commonwealth v. DiBenedetto, 475 Mass. 429, 431 n.7 (2016).

"An issue is not 'new' within the meaning of G. L. c. 278, §33E, where either it has already been addressed, or where it could have been addressed had the defendant properly raised it at trial or on direct review. See Commonwealth v. Gunter, 459 Mass. 480, 487 (2011), quoting Commonwealth v. Pisa, 384 Mass. 362, 365-366 (1981).

The defendant filed a motion for new trial arguing that he was denied effective assistance of counsel and that his due process rights were violated. The motion judge found the defendant did not meet his evidentiary burden on either of these claims. I have concluded that the defendant has not met his burden of demonstrating a new and substantial issue.

Therefore, after review of the pleadings submitted by the defendant, the defendant's application pursuant to G. L. c. 278, § 33E for leave to appeal from the denial of the defendant's motion for new trial is DENIED.

By the Court, (Cypher, J.)

/s/ Maura S. Doyle
Maura S. Doyle, Clerk

Dated: February 26, 2021